FILED

2015 Nov-18  AM 09:00
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA

---

| | |
|---|---|
| SAM MANZELLA and ROBERT TODD MISHKIN, individually and on behalf of all others similarly situated, | No. |
| | **COMPLAINT CLASS ACTION** |
| Plaintiffs, | |
| v. | |
| DRAFTKINGS, INC., and FANDUEL, INC. | |
| Defendants. | |

## I.       INTRODUCTION

Plaintiffs Sam Manzella ("Plaintiff Manzella") and Robert Todd Mishkin ("Plaintiff Mishkin") (together, "Plaintiffs") individually, and on behalf of all others similary situtated, by and through counsel, bring this action against DraftKings, Inc. ("DraftKings") and FanDuel, Inc. ("FanDuel") (together, "Defendants"), respectively.

## II.       NATURE OF THE ACTION

1.       This is a class action complaint against Defendants, two companies operating Daily Fantasy Sports ("DFS") websites in a manner that violates Alabama Law.

2.       Plaintiffs each bring this action on their own behalf and on the behalf of an Alabama class of persons (as defined in Section VI (Class Allegations)) who, like Plaintiffs, have sustained ascertainable losses arising out of Defendants' systematic and continued violation of

the Code of Alabama and various criminal laws (the "Class Members").  Under the authority of

Code of Alabama § 8-1-150, the loser of a gambling consideration can maintain a private, civil

action to recover damages from the winner.

3.      DraftKings is operating an illegal online sports betting (gambling) business within

the State of Alabama.

4.      FanDuel is operating an illegal online sports betting (gambling) business within

the State of Alabama.

5.      The Constitution of the State of Alabama expressly states:

> **Article IV. Section 65. Paragraph VIII. Lotteries and gift enterprises prohibited.**  The legislature shall have no power to authorize lotteries or gift enterprises for any purposes, and shall pass laws to prohibit the sale in this state of lottery or gift enterprise tickets, or tickets in any scheme in the nature of a lottery; and all acts, or parts of acts heretofore passed by the legislature of this state, authorizing a lottery or lotteries, and all acts amendatory thereof, or supplemental thereto, are hereby avoided.

Ala. Const.  art. IV § 65.  "[This Article] not only prohibits lotteries, but it also prohibits any

'gift enterprise' or 'scheme in the nature of a lottery.' 'In this State, therefore, the public policy is

emphatically declared against lotteries, or any scheme in the nature of a lottery, both by

Constitution and by statutes.' Opinion of the Justices No. 373, 795 So.2d 630, 640 (2001),

quoting Black's Law Dictionary 231 (6th ed.1990) (citing Try–Me Bottling Co., 235 Ala. at 212,

178 So. at 234).

6.      Throughout this operative Complaint, a reference to "betting" or "bet(s)" shall also

have the meaning of "gambling" or "gamble(s)," respectively, and such words shall be used

interchangeably herein, and these terms are also necessarily "scheme[s] in the nature of a lottery"

as defined under Alabama law.

7.      Defendants define their sports betting scheme as DFS in a specious attempt to circumvent Alabama law which expressly prohibits "gambling." In Alabama, "[a] person engages in gambling if he stakes or risks something of value upon the outcome of a contest of chance or a future contingent event not under his control or influence, upon an agreement or understanding that he or someone else will receive something of value in the event of a certain outcome." A scheme is considered gambling "if chance is the dominant factor in determining the result of the game, even though the result may be affected to some degree by skill or knowledge." Opinion of the Justices No. 373, 795 So.2d at 635,  (citing 38 C.J. Lotteries § 5 (1925)).

8.      Defendants' sports gambling contests are based upon the performance of teams and individuals that participate in NCAA college football, NCAA college basketball, NFL, NBA, MLB and NHL, and also upon the partial or final result of games.  Such sporting events and/or players's performance are not under the control or influence of any DraftKing or FanDuel bettor, and there is an agreement and/or understanding the either the losing bettor or the winning bettor will receive monetary compensation in the event of a certain outcome of the sporting events (full or partial) and/or player performance.

9.      In traditional fantasy sports leagues contestants draft their teams before the season, maintaining the same core roster for months.

10.      In contrast to season-long fantasy sports, Defendants accept wagers from bettors for various sporting events using a scheme they created that assigns values (points) based upon the performance of athletes and teams engaged in amateur and professional athletic competitions.

11.    After the sporting events are concluded, Defendants calculate a score using the scheme they created that awards points based upon the various individual college and professional athletes' performance and pays bettors that have the highest total number of points.

12.    Bettors select an entry fee, which is up to $5,000, and the number of the games or teams they wish to play. If their roster generates more points than their rivals on that day or week, they win all the money in the pot, minus Defendants' average cut of, upon information and belief, 6.5%.

13.    Upon information and belief, Defendants use "bots" or fake accounts to act as "shills" in the gambling scheme in order that certain winnings go to the "house" (DraftKings or FanDuel), and also creating the illusion to the Defendants user of interacting with a gambler on equal footing.  The employment of "shills" (or "bots"/fake accounts) employs a similar concept to those "shills" that are permitted by law in states with casinos such as Nevada, but Alabama does not permit any gambling, never mind the use of "shills" in the form of "bots" or otherwise fake accounts.  And regardless, in states where such devices are employed, there is no illusion, nor effort to create the illusion, that the "house" is not winning the losing bets (in the form of monies that are attributed to "shills") and in the case of Defendants, there is no disclosure of the use of "shills" nor any legal basis for doing so in Alabama.

14.    DraftKings appears to operate under the misrepresentation that DFS is a game of skill—not chance, and thus legal: "The legality of daily fantasy sports is the same as that of season long fantasy sports.  Federal Law and 45 of the 50 US state allow skill based gaming. Daily fantasy sports are a skill game and are not considered gambling." *See* DraftKings.com. However, DraftKing knows that its DFS is not a game of skill but instead is one of chance.

4

15.    FanDuel also appears to operate under the misrepresentation that DFS is a game of skill—not chance, and falsely claims that its gambling operations were made legal by the Unlawful Internet Gambling Enforcement Act of 2006 ("UIGEA").

▾ Is this site legal in the US and Canada?

Yes, fantasy sports is considered a game of skill and received a specific exemption from the 2006 Unlawful Internet Gambling Enforcement Act. FanDuel uses exactly same rules as any other season long fantasy sports game, the only difference is that our games last only a day. Thanks to fantasy sports being specifically excluded from laws affecting online betting, FanDuel is safe for players in the US and Canada.

*See* https://www.FanDuel.com/p/AddFundsFtd?

16.    Recently, Alabama residents and organizations have grown concerned about the proliferation of online gambling from the likes of DraftKings and FanDuel, among others. "'[Defendants' players] pick their teams and wait to see if their teams have won or lost and so it's definitely using the word I [sic] bet. And as soon as you use that word and as soon as you've used that word, then you've gambled,' said Roger Olsen with the Alabama Council on Compulsive Gambling."    http://wkrg.com/2015/10/18/draft-kings-and-fan-duel-skirting-alabama-law/   "Olsen says sites like Fan Duel and Draft Kings could enable some to develop a gambling addiction."

17.    In fact, around the country, lawmakers have begun to scrutinize DraftKings' and FanDuel's business model and operations, alleging substantial similarities between Defendants' DFS and online poker and other gambling websites.  For instance, the General Counsel for the Georgia State Lottery, Joseph Kim, wrote Defendants and noted that Georgia's constitution bans gambling except for state lottery activities. *See* http://bigstory.ap.org/article/d2f22b64c83748468dfc6e4d84f8b001/   georgia-joins-states-scrutinizing-fantasy-sports-companies.

18.     In referring to Defendants, former Congressman Jim Leach stated that his anti-gambling act, the UIGEA, was supposed to stop gambling on the internet – not promote it. Former Rep. Jim Leach said lawmakers had no idea daily fantasy sports would "morph into today's cauldron of daily betting."[1]   In fact, former Congressman Leach told the Associated Press: "There is no credible way fantasy sports betting can be described as not gambling." *Id.* "Only a sophist can make such a claim." *Id.* The federal regulation is codified at 31 U.S.C. 5361 *et seq.* The Act expressly provides that it shall not be construed as altering, limiting, or extending any state law that prohibits, permits, or regulates gambling within the United States. 31 U.S.C. 5361 § 5361(b).

19.     The Federal Bureau of Investigation and the Department of Justice are also probing whether the business model of DFS operators like DraftKings and FanDuel violate this and other federal laws. [2]

20.     Additionally, on October 15, 2015, the Nevada Gaming Control Board ("NGCB") ordered DraftKings and FanDuel to cease their operations in the State of Nevada, because their operations constitute gambling and they need a gambling license to continue operations in that state.[3]

21.     A day after the NGCB issued its Notice, the State of Nevada Office of the Attorney General ("NOAG") offered its legal analysis, concluding that "In short, daily fantasy sports constitute sports pools and gambling games. They may also constitute lotteries, depending

---

[1] http://bigstory.ap.org/article/7b3af0d8b0c04f059e8b301adf8b1784/former-congressman-says-dfs-cauldron-daily-betting
[2] https://www.washingtonpost.com/news/sports/wp/2015/10/20/draftkings-fanduel-fbi-investigation-could-freeze-daily-fantasy-players-money-for-years/
[3] See NOAG October 15, 2015 Notice, attached hereto as **Exhibit  A**.

on the test applied by the Nevada Supreme Court.  As a result, pay-to-play daily fantasy sports cannot be offered in Nevada without licensure."[4]

22.     On November 10, 2015, Eric T. Schneiderman of the State of New York Office of the Attorney General sent DraftKings and FanDuel Notices to Cease and Desist and Notice of Proposed Litigation.[5]   According to Attorney General Schneiderman, the Office's "review conclude[d] that Defendants' operations constitute illegal gambling under New York law . . . ." Moreover, it stated that

> New York Attorney General has been deeply concerned to learn from health and
> gambling experts that DFS appears to be creating the same public health and
> economic problems associated with gambling, particularly for populations prone
> to gambling addiction and individuals who are unprepared to sustain losses, lured
> by the promise of easy money. Certain structural aspects of DFS make it
> especially dangerous, including the quick rate of play, the large jackpots, and the
> false perception that it is eminently winnable. Ultimately, it is these types of
> harms that our Constitution and gambling laws were intended to prevent in New
> York.

*Id.* at 2.

23.     Gambling is expressly prohibited under Alabama law. "Most American courts, and indeed the courts of Alabama, have long recognized the 'American Rule,' which labels as a lottery an activity in which a prize is awarded by chance and for consideration, when chance is the dominant element, even when a degree of skill may affect the outcome."  Opinion Of The Justices, 795 So. 2d 630, 643 (Ala. 2001).  Alabama explicitly "reject[s] the 'English Rule,' which would permit any activity where a prize is awarded by chance for a consideration, and in

---

[4] See NOAG October 16, 2015 Legal Analysis, attached hereto as **Exhibit  B**.
[5] See NOTICE TO CEASE AND DESIST AND NOTICE OF PROPOSED LITIGATION
PURSUANT TO NEW YORK EXECUTIVE LAW § 63(12) AND GENERAL BUSINESS
LAW § 349, dated November 10, 2015, sent to DraftKings and FanDuel, attached hereto as
**Exhibits  C** and **D**, respectively.

which some degree of skill is present, to escape the anti-lottery provision of § 65 of the Alabama Constitution." <u>Opinion Of The Justices</u>, 795 So. 2d at 643 (Ala. 2001).  This constitutional provision "does not prohibit the Legislature from authorizing gambling."  <u>Id.</u>  Gambling in general and the promotion thereof are prohibited in the state by provisions of the Alabama Criminal Code, Article 2, Chapter 12, Title 13A, but the Legislature has reserved in Section 13A-12-31 the right to enact local statutes, or general statutes applying to one or more municipalities in a class less than the whole of the state, that exempt pari-mutuel wagering at race meetings from the general prohibition of the Alabama Criminal Code.   However, the Alabama legislature has not authorized gambling in the form of Defendants' DFS scheme. Defendants' DFS gambling scheme is unauthorized by the Alabama legistlature or local statute and is one where chance is the dominant element determining the outcome.

24.    "Alabama has had in place for more than 150 years a statute prohibiting the enforcement of a contract giving rise to a gambling debt." <u>Bussey v. Macon Cty. Greyhound Park, Inc.</u>, 2011 WL 1216296, at *4 (M.D. Ala. Mar. 31, 2011)  Under Alabama law, "[a]ll contracts founded in whole or in part on a gambling consideration are void. Any person who has paid any money or delivered any thing of value lost upon any game or wager may recover such money, thing, or its value by an action commenced within six months from the time of such payment or delivery." Code of Ala. § 8-1-150(a). "Any other person may also recover the amount of such money, thing, or its value by an action commenced within 12 months after the payment or delivery thereof for the use of the wife or, if no wife, the children or, if no children, the next of kin of the loser."  *Id.* § 8-1-150(b).  Alabama Supreme Court has recognized the existence of a gambling contract between the patron and the casino.  "[T]he general rule is that

'[c]asino-style wagering is essentially an adhesion contract between the casino and its patrons,' where, 'the casino defines the terms of the contract (the rules of the wager) and allows patrons to play the game as-is, with no possibility of changing the rules.' Macon County Greyhound Park, Inc. v. Knowles, 39 So.3d 100, 110 (Ala. 2009).

25.     Under the Alabama Criminal Code, "[a] person commits the crime of simple gambling if he knowingly advances or profits from unlawful gambling activity as a player." Code of Ala. § 13A-12-21(a). "Simple gambling is a Class C misdemeanor." *Id.* 13A-12-21(b). "A person commits the crime of promoting gambling if he knowingly advances or profits from unlawful gambling activity otherwise than as a player." *Id.* 13A-12-22(a). "Promoting gambling is a Class A misdemeanor." *Id.* 13A-12-22(b). A person commits the crime of conspiracy to promote gambling if he conspires to advance or profit from gambling activity otherwise than as a player. *Id.* 13A-12-23(a). Conspiracy to promote gambling is a Class A misdemeanor. *Id.* 13A-12-23(c).   "A person 'profits from gambling activity' if he accepts or receives money or other property pursuant to an agreement or understanding with any person whereby he shares or is to share in the proceeds of gambling activity." *Id.* 13A-12-20(9).

26.     "A person engages in gambling if he stakes or risks something of value upon the outcome of a contest of chance or a future contingent event not under his control or influence, upon an agreement or understanding that he or someone else will receive something of value in the event of a certain outcome." *Id.* 13A-12-20(4).   Under Alamaba law, the term "chance" means 'a lack of control over events or the absence of 'controllable causation'—'the opposite of intention.'" Opinion of the Justices No. 373, 795 So.2d at 635, quoting Black's Law Dictionary 231 (6th ed.1990).

27.     Defendants' DFS schemes are illegal gambling operations each masquerading as a "game of skill."  Defendants' websites, DrafKings.com and FanDuel.com, are illegal gambling devices.  Plaintiffs and Class Members pay and did pay Defendants' illegal DFSs over the last 6 months and Defendants' operation of the illegal DFS proximately caused Plaintiff's and Class Members' injuries.

28.     Defendants take bets on sporting events or partial sporting events and the performance of players, either full or partial performance, in such events, and such acceptance of bets or gambling consideration are gaming and/or gambling contracts.

29.     Plaintiffs and Class Members paid money to Defendants that was lost on games and/or wagers.. Additionally, Plaintiffs and Class Members paid money to Defendants that was lost on games and/or wagers when the "bots" or fake accounts ("shills") are or were employed. Alternatively, Plaintiffs and Class Member lost the bets (gambling consideration and/or money paid) to Defendants as the stakeholders that took the gambling consideration from the Plaintiffs and Class Members.  Alternatively, Plaintiffs and Class Members lost the bets (gambling consideration and/or money paid) to Defendants (as the agents) that took the bets (gambling consideration and/or money paid) from the Plaintiffs and Class Members (principal(s)) for the illegal gambling and/or gaming contracts.

30.     Persons, like Plaintiffs herein and the Class Members, can seek to recover damages from DraftKings in the form of restitution and lost bets (gambling consideration and/or money paid).

31.     Defendants define their sports betting scheme as DFS in a deceptive attempt to circumvent the Alabama Criminal Code. Defendants' operations are unlawful under Alabama's

criminal provisions governing gambling. Code of Ala. §§ 11-65-1 through 11-65-47; 13A-12-20

through 13A-12-92; 34-6-7; 34-6-12 through 34-6-14; 40-26A-1 through 40-26A-17

32.     Defendant's violations of the aforementioned statutes further evidences there was

a "contract[] founded in whole or in part on a gambling consideration" between Defendants, on

the one hand, and Plaintiffs and Class Members, on the other, and such contracts was supported

by "gambling consideration," such gambling consideration being the monies paid by Plaintiffs

and Class Members to Defendants.

33.     Plaintiffs and the Class Members are entitled, as a matter of law, to recover the

money they lost, and in addition, are entitled to any and all fees that inured to Defendants on

account of the contracts being void.

34.     As a final note, Washington, one of five jurisdiction in which Defendants do not

operate because Defendants believe that it is unlawful for them to do so, prohibits fantasy sports

wagering because it falls under Washington's definition of gambling, which is "risking

something of value on the outcome of a contest of chance or a future contingent event not under

the person's control or influence to receive something of value in the event of a certain outcome

(RCW 9.46.0237).

35.     Indisputably, Washington's law and Alabama's law are substantially identical to

one another. Thus, Defendants face an insurmountable obstacle to even attempt a colorable

allegation that its conduct operating out of the State of Alabama is lawful in any manner

whatsoever.

## III.     PARTIES

36.     Plaintiff, Sam Manzella, is a resident of Jefferson County, Alabama, and is a citizen of Alabama.  He brings this action on behalf of himself individually, and on behalf of a class of persons similarly situated as described in the class definition below.

37.     Plaintiff, Robert Todd Mishkin, is a resident of Jefferson County, Alabama, and is a citizen of Alabama.  He brings this action on behalf of himself individually, and on behalf of a class of persons similarly situated as described in the class definition below

38.     Defendant DraftKings, Inc., is a Delaware corporation with its principal place of business in Boston, Massachusetts.

39.     Defendant FanDuel, Inc. is a Delaware corporation with its principal place of business in New York, New York.

40.     Defendant DraftKings conducts business throughout the State of Alabama, having thousands of Alabama residents accessing and gambling on their website DraftKings.com.

41.     Defendant FanDuel conducts business throughout the State of Alabama, having thousands of Alabama residents accessing and gambling on their website FanDuel.com.

42.     This Honorable Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. 1331, which confers upon the Court original jurisdiction over all civil actions arising under the laws of the United States. This Honorable Court has jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. 1332 (d), because the proposed class consists of 100 or more members; the amount in controversy exceeds five million ($5,000,000.00) exclusive costs and interest and minimal diversity exists.  This Honorable Court has jurisdiction pursuant to diversity jurisdiction, 28 U.S.C. 1332 (a), because the plaintiff and defendants are citizens of different states and the matter in controversy exceeds the sum or value of $75,000

exclusive of intrest and costs.  This Honorable Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. 1367.

## IV.    FACTUAL BACKGROUND

43.    Defendants are operating illegal online sports betting businesses within the State of Alabama.

44.    Defendants accept wagers from bettors for various sporting events using a scheme they created that assigns values (points) based upon the performance of athletes engaged in amateur and professional athletic competitions.

45.    After the sporting events are concluded, Defendants calculate a score using the system they created that awards points based upon the various individual college and professional athletes performance. Defendants then pay the bettors who have the highest total number of points.

46.    Plaintiff, Mr. Manzella, is an individual who has utilized DraftKings' website.  He has incurred monetary losses as a result of said use. Thus, Defendant DraftKings is indebted to Plaintiff Manzella for, or received to Plaintiff Manzella's use, the money so lost and paid, or converted the goods won of the Plaintiff Manzella to DraftKings' use.

47.    Plaintiff, Mr. Mishkin, is an individual who has utilized FanDuel's website.  He has incurred monetary losses as a result of said use. Thus, Defendant FanDuel is indebted to Plaintiff Mishkin for, or received to Plaintiff Mishkin's use, the money so lost and paid, or converted the goods won of Plaintiff Mishkin to FanDuel's use.

48.    Plaintiffs and Class Members allege that gaming on Defendants' DFS gambling platform/device requires very little or no skill and that the outcome therefore is determined

largely by chance. In fact, many of DraftKings and FanDuel customers lack even a rudimentary understanding of sports, or betting strategy in general, and yet participate in Defendants' operations, and lose and win based on pure luck.

49.     Defendants' sports betting scheme is a game of chance that involves little skill. The chance of element predominates over any skill set.

50.     Defendants' sports wagering scheme involves selecting a set number of athletes that will play in a single sporting event.

51.     Defendants establish a point system that correlates with the athletes' performance during a single athletic event.

52.     Defendants determine which athletes its bettors can select and assigns a handicap (spread) based upon the athletes' perceived potential to score points.

53.     Defendants eliminate almost the entire element of skill by establishing a handicap (similar to a point spread) for a limited number of athletes it determines can be used for a particular waging event.

54.     By establishing a "spread" for each athlete and limiting the number of athletes the bettors can use, bettors are engaging in a gambling scheme predominately based upon chance.

55.     Alabama's civil and criminal law (and the UIGEA) prohibit Defendants' sports gambling scheme because it is a game of chance.

56.     According to a survey conducted by the Sports Business Journal, only 1.3% of players realized gains from their participating in online fantasy sports.[6] This is akin to the odds one would find at a casion sports gambling operation.

57.     DFS gambling platforms/devices, including the sports betting schemes implemented by Defendants, return casino-type "odds" and involve little skill.

58.     A player may win with a randomly generated roster, just as one may win with a carefully curated roster.

59.     Defendants' gambling schemes are a game of chance because an individual athlete's performance (especially in one game) will always be affected by material elements of chance that affect scoring and winning outcomes including variables such as player injury, fumbles, weather conditions, controversial officiating, suspension, or other off field circumstances.

60.     The bettors or gamblers have no measure of control over all the variables that affect the performance of the college and professional athletes, rendering the Defendants' scheme a game of chance.

61.     Defendants represents that their gambling scheme is not illegal.

62.     Defendants' representation that the UIGEA legalized bookmaking and gambling under the guise of "fantasy sports" is false and misleading.

63.     The UIGEA did not legalize fantasy sports, it merely provided an exemption to banks from being held liable for processing transactions relating to certain fantasy sports.

---

[6] http://www.sportsbusinessdaily.com/Journal/Issues/2015/07/27/Opinion/From-the-Field-of-Fantasy-Sports.aspx.

64.     The UIGEA was enacted to regulate banks and other payment processors, not bookmakers.

65.     Under the UIGEA's definition, unlawful internet gambling means "to place, receive, or otherwise knowingly transmit a bet or wager by any means which involves the use, at least in part, of the Internet" that is illegal under federal, state, or tribal law.

66.     Alabama law prohibits sports gambling schemes, including Defendants' DFS gambling platforms/devices, and prohibits Defendants from accepting payments from or entering into gambling contracts with persons in Alabama, including Plaintiffs and Class Members.

## V.     INVALIDITY OF DEFENDANTS' ARBITRATION PROVISIONS, CLASS WAIVERS, AND TERMS OF USE

### DraftKings' Arbitration Provision and Terms of Use

67.     At the outset, upon information and belief, when Plaintiff Manzella and Class Members joined DraftKings.com, DraftKings had no arbitration provision or class waiver provision in its Terms of Use.

68.      Regardless, DraftKings' Terms of Use is not a valid, enforceable contract.

69.     Plaintiff Manzella and Class Members were fraudulently induced into placing money onto Defendant DraftKings's platform because it was supposed to be a fair game of skill, but instead is no more than a game of chance, thus illegal gambling under Alabama law.

70.     The so-called "Terms of Use" do not constitute a valid, mutual agreement because the promises made by DrafKings is illusory.  Indeed, there is no restriction on DraftKings' ability to terminate the "agreement" or to refuse to perform. For example, the so-called "Terms of Use" provide that DraftKings and related individuals such as officers and directors are released from any liability for any claim by the user "whatsoever": "By entering into a Contest or

16

accepting any prize, entrants, including but not limited to the winner(s), agree to indemnify, release and to hold harmless DraftKings, its parents, subsidiaries, affiliates and agents, as well as the officers, directors, employees, shareholders and representatives of any of the foregoing entities (collectively, the "Released Parties"), from any and all liability, claims or actions of any kind whatsoever, including but not limited to … [examples of various types of liability listed]." *See* https://www.draftkings.com/help/terms

71.     Yet another reason why the so-called "Terms of Use" is an illusory contract is that it purports to give DraftKings the right, "without prior notice," to "revoke any or all of your rights granted hereunder." Thus, once again, DraftKings is not bound to any performance obligation.  *See* https://www.draftkings.com/help/terms

72.     The Terms of Use purport to require arbitration, but gives DrafKings the exclusive right to revoke the arbitration provision because it states that "Any claim or dispute between you and DrafKings that arises in whole or in part from the Terms of Use, the Website or any Contest shall be decided exclusively by a court of competent jurisdiction located in…" Suffolk County, Massachusetts. *See* https://www.draftkings.com/help/terms

73.     In addition, when signing up, a user only has to check a box saying he or she has read the Terms of Use to sign up for the website, and the deposit of money and entry into contests is done through separate transactions that do not reference or refer to any Terms of Use. Moreover, when signing into DraftKings.com at any particular time, no "Terms of Use" are referenced or otherwise shown.



74.     Another reason why the so-called "Terms of Use" is an illusory contract is that it purports to reserve to DraftKings the right to deny service to any user for any reason "whatsoever": "DraftKings reserves the right, in its sole and absolute discretion, to deny any contestant the ability to participate in head-to-head contests for any reason whatsoever." Thus, DraftKings is not bound to any performance obligation. *See* https://www.draftkings.com/help/terms

75.     As a result of all of the foregoing numbered paragrpahs, Plaintiff Manzella and Class Members did not assent or agree to arbitrate any claims or waive their right to bring any claims as a class for any gambling contract formed with DrafkKings.

76.     DraftKings' Terms of Use are procedurally and substantively unconscionable.

### **FanDuel's Arbitration Provision and Terms of Use**

77.     FanDuel's Terms of Use is not a valid, enforceable contract.

78.     Plaintiff Mishkin and Class Members were fraudulently induced into placing money onto Defendant FanDuel's platform because it was supposed to be a fair game of skill, but instead is no more than a game of chance, thus illegal gambling under Alabama law.

79.     The site contains a hidden "Terms of Use" page.  Plaintiff Mishkin and Class Members are not required to sign, initial, check any boxes, or otherwise confirm that they agreed to the arbitration and class waiver sections of the "Terms of Use," and in fact did not assent or agree to arbitrate any claims or waive their right to bring any claims as a class.  Upon review, it appears that a link called "Terms of Service" appears as a greyed out link in small text on the bottom of the sign up page and is specifically designed in a way to make sure terms are unnoticeable.  The relevant, miniscule text says "Joining confirms you're 18+ years of age and that you agree to our *Terms of Service*.  There does not appear to be any "Terms of Service" on the FanDuel.com website, though the link leads to a document called "Terms of Use."



80.     In fact, the place where you make payment for the gambling monies on FanDuel.com does not even have the small greyed out text or any link or reference whatever to the     "Terms     of     Service,"     never     mind     "Terms     of     Use."         *See*

https://www.fanduel.com/p/AddFundsFtd? Moreover, when signing into FanDuel.com at any particular time, no "Terms of Use" are referenced or otherwise shown.



81.     Plaintiff Mishkin and Class Members are not required to sign, initial, check any boxes, or otherwise confirm that they agreed to the arbitration and class waiver sections of the "Terms of Use" and did not assent to or agree to arbitrate any claims or waive their right to bring any claims as a class.

82.     Regardless, the so-called "Terms of Use" do not constitute a valid, mutual agreement because the promises made by FanDuel is illusory.  Indeed, there is no restriction on FanDuel's ability to terminate the "agreement" or to refuse to perform.  For example, the so-called "Terms of Use" provide that FanDuel and related individuals such as officers and directors are released from any liability for any claim by the user whatsoever:  "You agree to release and to indemnify, defend and hold harmless FanDuel and its parents, subsidiaries, affiliates and agencies, as well as the officers, directors, employees, shareholders and representatives of any of the foregoing entities, from and against any and all losses, liabilities, expenses, damages, costs

(including attorneys' fees and court costs) claims or actions of any kind whatsoever arising or resulting from your use of the Service, your violation of these Terms of Use, your receipt, ownership, use or misuse of any prize, and any of your acts or omissions that implicate publicity rights, defamation or invasion of privacy." *See* https://www.fanduel.com/terms

83.    Another reason why the so-called "Terms of Use" is an illusory contract is that it purports to reserve to FanDuel the right to deny service to any user for any reason whatsoever: "You acknowledge and agree that FanDuel may remove any User Content and terminate any FanDuel account at any time for any reason (including, but not limited to, upon receipt of claims or allegations from third parties or authorities relating to such User Content)." Thus, FanDuel is not bound to any performance obligation. *See* https://www.fanduel.com/terms

84.    Yet another reason why the so-called "Terms of Use" is an illusory contract is that it purports to give FanDuel the right "to cancel contests, in our sole discretion, without any restrictions." Thus, once again, FanDuel is not bound to any performance obligation. *See* https://www.fanduel.com/terms

85.    FanDuel's Terms of Use are procedurally and substantively unconscionable.

## Plaintiffs and Class Members Had No Agreement to Arbitrate or Waive Class Claims With Defendants

86.    As a result of all of the information provided in the foregoing numbered paragrpahs, Plaintiffs and Class Members did not assent or agree to arbitrate any claims or waive their right to bring any claims as a class for any gambling contract formed with Defendants.

87.    Further, the entirety of the contracts between Defendants and Plaintiffs and Class Members are void as a matter of law (as noted herein), including any alleged arbitration or class waiver agreements or provisions in the "Terms of Use."

88.     Alternatively, any alleged arbitration or class waiver provision or agreement included in any Terms of Use is based on illegal and/or invalid consideration, making any alleged arbitration provision or agreement between Defendants and Plaintiffs and Class Members invalid as a matter of law.

89.     Any alleged arbitration or class waiver agreement or provision are procedurally and substantively unconscionable.

90.     As a direct and proximate result of the actions described above, Plaintiffs and Class Members have been damaged.

## VI.     CLASS ALLEGATIONS

91.     A class action is the proper form to bring Plaintiffs claims under Federal R. Civ. Proc. 23. The potential class is so large that joinder of all members would be impracticable. Additionally, there are questions of law or fact common to the class, the claims or defenses of the representative parties are typical of the claims or defenses of the class, and the representative parties will fairly and adequately protect the interests of the class.

92.     This action satisfies all of the requirements of Federal R. Civ. Proc. 23, including numerosity, commonality, typicality, adequacy, predominance and superiority.

93.     **Numerosity:** the Class is so numerous that joinder of all members is impracticable. While the exact number is not known at this time, it is generally ascertainable by appropriate discovery. News accounts discuss how millions of users compete on the websites of Defendants.

94.     **Commonality**: the claims made by Plaintiffs and Class Members meet the commonality requirement because they present shared questions of law and fact, and resolving

these questions will resolve the class wide litigation. These shared questions predominate over individual questions, and they include, without limitation:

      a.     Whether Plaintiffs and Class Members have entered into contracts with Defendant;

      b.     Whether Plaintiffs and Class Members paid monies to Defendants in consideration of those contracts;

      c.     Whether the contracts entered into between Defendants and Plaintiffs and Class Members are illegal "contracts" supported by "gambling consideration";

      d.     Whether such contracts are per se void, pursuant to Alabama law;

      e.     Whether Defendants' operations are a game of chance under all applicable laws and rules;

      f.     Whether Defendants promoted, advanced and profited from illegal gambling in violation of Alabama law;

      g.     Whether Defendants' operations violate Alabama civil law;

      h.     Whether Plaintiffs and Class Members have been damaged;

      i.     Whether the Terms of Use are unconscionable, illusory, fraudulent or otherwise invalid;

      j.     Whether there was an alleged arbitration agreement or provision operative between Defendants and Plaintiffs and Class Members.

95.    **Typicality:** Plaintiff's claims are typical of those of the other Class members because Plaintiffs, like every other Class Member, were induced to use Defendants' sites based

on false and misleading advertisements that DFS was a game of skill when, in fact, it is a game of chance, thus constituting illegal gambling under Alabama law.

96.     The claims of the class representative Plaintiffs are furthermore typical of other Class Members because they make the same claims as other class members; and Plaintiffs' claims and those of the Class Members are based upon the same legal theories, and arise out of the same practices and course of conduct engaged in by Defendants.  Plaintiffs have an interest in seeking compensation from Defendants on behalf of all Class Members.

97.     Further, the representative Plaintiffsa damages arise out of nearly identical and repetitive policies and practices engaged in by Defendants.

98.     **Adequacy:**  Plaintiffs will fairly and adequately represent and protect the interests of the Class Members in that he has no disabling conflicts of interest that would be antagonistic to those of the other Class Members. Plaintiffs seek no relief that is antagonistic or adverse to the Class Members and the infringement of the rights and the damages they have suffered are typical of other Class Members.

99.     **Superiority:** The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporate Defendants. Further, even for those

Class Members who could afford to litigate such a claim, it would still be economically impractical.

100.     The nature of this action and the nature of Alabama laws available to Plaintiffs and the Class Members makes the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and the Class Members for the wrongs alleged because Defendants would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Members with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by the Class Members and will establish the right of each Class Members to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

101.     The proposed "Class" is described as follows:

**"All persons in the State of Alabama who participated in DraftKings' or FanDuel's DFS, deposited money in a DraftKings or FanDuel account, and lost money in any game or contest during the six months prior to the filing of the original complaint."**

102.     Plaintiffs reserve the right to modify or amend the definition of the proposed Class and to modify, amend, add or remove proposed subclasses, before the Court determines whether certification is appropriate and as the parties engage in discovery.

103.     Excluded from the Class are:

a.   Defendants and any entities in which Defendants have a controlling interest;

b.   Any entities in which Defendants' officers, directors, or employees are employed and any of the legal representatives, heirs, successors, or assigns of Defendants;

c.   The Judge to whom this case is assigned and any members of the Judge's immediate family and any other judicial officer assigned to this case;

d.   All persons or entities that properly execute and timely file a request for exclusion from the Class;

e.   Any attorneys representing the Plaintiffs or the Class.

**COUNT I - VIOLATION OF ALABAMA CODE § 8-1-150(a): GAMBLING**

104.   Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

105.   Plaintiffs represents themselves and all Class Members in this Count and asserts this Count on behalf of the same.

106.   Defendants' DFS gambling platforms/devices are illegal gambling devices and were operated by Defendants in Alabama in violation of Alabama law.

107.   Defendants, through their DFS gambling platform/device, promoted, advanced and profited from illegal gambling in violation of Alabama law

108.   There was a contract between Defendants, on the one hand, and Plaintiff and Class Members, on the other, and such contract was supported by gambling consideration, such

gambling consideration being the monies paid by Plaintiff and Class Members to Defendants for playing, betting, and/or wagering on their DFS gambling platform/device.

109.    The Plaintiffs and Class Members paid to play and did play on Defendants' DFSs during the past six months prior to the filing of the original complaint.

110.    As to Plaintiffs and Class Members, Defendants are indebted to the Plaintiffs and Class Members for, or received to the Plaintiffs use, the money so paid and lost.

111.    As a direct and proximate result of said Defendants' operation of their illegal DFS gambling platform/device, the Plaintiffs have been injured.

112.    Plaintiffs seek recovery of all monies they paid to Defendants DraftKings and FanDuel as wagers on Defendants illegal DFS gambling platform/device during the past six months prior to the filing of this complaint pursuant to Alabama Code § 8-1-150(a), plus interests and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and members of the proposed Class pray for relief and judgment against Defendant, as follows:

a.      For an order certifying the Class, appointing Plaintiffs and their counsel to represent the Class and notice to the Class to be paid by Defendants;

b.      For an award of actual damages, compensatory damages, and/or appropriate relief;

c.      For a declaration that Defendants' DFS gambling platforms/devices are illegal under Alabama law;

d.      For Plaintiffs' reasonable attorneys' fees, as permitted by law;

27

e.      For Plaintiffs' costs incurred;

f.      For pre-judgment and post-judgment interest at the maximum allowable rate on any amounts awarded; and

g.      For such other and further relief that this Court deems just and proper under equity or law, including the award of punitive damages.

DATED this 17th day of November, 2015.

*/s/ Taylor C. Bartlett*
W. LEWIS GARRISON, JR.,
    lewis@hgdlawfirm.com
CHRISTOPHER HOOD,
    chood@hgdlawfirm.com
TAYLOR C. BARTLETT,
    taylor@hgdlawfirm.com
**HENINGER GARRISON DAVIS, LLC**
2224 First Avenue North
Birmingham, AL 35203
Tel: 205-326-3336
Fax: 205-326-3332

JAMES F. MCDONOUGH, III.
GA Bar No.: 117088
    jmcdonough@hgdlawfirm.com
    *PHV forthcoming*
**HENINGER GARRISON DAVIS, LLC**
3621 Vinings Slope, Suite 4320
Atlanta, GA 30339
Tel: 404-996-0869
Fax: 205-326-3332

THOMAS J. SPINA
    tommy@tommyspina.com
**FAWAL & SPINA**
1330 21st Way S., Suite 200
Birmingham, AL 35205
Tel: 205-939-1330
Fax: 205-933-0101

*Attorney for Plaintiffs and all others similarly situated*
